## STATE OF CONNECTICUT *v.* SCOTT SMITH
(AC 21991)

Schaller, Flynn and Peters, Js.

Argued April 1—officially released October 22, 2002

*John J. Kelly,* for the appellant (defendant).

*John A. Connelly,* state's attorney, with whom was *Robin Lipsky,* assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Scott Smith, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55[1] and 53a-55a.[2]

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . .

\* \* \*

"(b) Manslaughter in the first degree with a firearm is a class B felony and any person found guilty under this section shall be sentenced to a term

On appeal, the defendant claims, inter alia, (1) that the evidence adduced at trial was insufficient to establish his guilt under § 53a-55a, (2) that, in excluding certain evidence, the court denied him his right to establish a defense under the United States and Connecticut constitutions, and (3) that the court improperly instructed the jury, thereby denying his constitutional rights. We conclude that in excluding certain evidence at trial, the court deprived the defendant of his right to present a defense. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial.[3]

The jury reasonably could have found the following facts. On December 29, 1998, the defendant, a police officer with the New Milford police department, was working the 9 a.m. to 5 p.m. shift in the detective division assisting in drug investigations. At approximately 11 a.m., the defendant was at the police station when David Shortt, a detective with the New Milford police department, informed him that Robert Cramer, a sergeant with the New Milford police department, was in foot pursuit of the victim, Franklyn Reid. The defendant and Shortt left the police station in an unmarked vehicle and headed toward Cramer's location.

As the defendant and Shortt traveled along Route 202 in New Milford, they noticed a man walking on the side of the road. They turned their vehicle around at a nearby intersection and drove back to determine whether the man they had seen was the victim. The defendant saw the person walking in the parking lot of a gasoline station and approached in the vehicle to within ten to

of imprisonment . . . of which five years of the sentence imposed may not be suspended or reduced by the court."

[3] In light of our conclusion relating to the defendant's evidentiary claim, we do not reach his claims that he was denied his right to a fair trial by prosecutorial misconduct or that the court improperly denied his motion for a new trial.

fifteen feet of him. The officers identified the person as the victim at that time.

The victim, who was wearing baggy clothes and carrying a light jacket or a sweatshirt, saw the officers approach. As the defendant opened the door to exit the vehicle, intending to catch and arrest the victim, the victim immediately started to run "very fast" toward Route 202. The defendant gave chase on foot, running very fast and following the victim through the parking lot and out into the street across traffic. The defendant yelled repeatedly, "Stop, police. Stop, police." After they crossed Route 202, the defendant chased the victim along the road, between the edge of the lane and the curb, until the victim suddenly turned left and ran onto a grassy area along the road. During the chase, the defendant continued to yell to the victim, "Stop, police." The grassy area led to an embankment. The area is near a house or a wooded area, and the defendant expected the victim to run into the wooded area. The victim did not run up the embankment; rather, the victim turned suddenly back to the right, toward the road and straight into traffic without looking. The defendant, who did not turn as quickly as the victim, ended up running past the victim. He observed the victim run into the street and stop at approximately the middle of the roadway.

The defendant observed the victim standing with his back to him; he could not see the victim's hands. At that time, the victim looked back at the defendant with what the defendant termed a "confrontational" or "thousand yard stare." Consistent with training that he had received as a police officer, the defendant perceived those looks, or cues, as indicative of a threat to his safety. The defendant drew his sidearm from the holster on his hip and pointed it at the victim, cradling the weapon with both hands. Immediately after drawing his weapon, the defendant began yelling to the victim, "Show me your hands, show me your hands," and he

began to approach him. The defendant wanted to "get both of [them] out of the middle of the road. The last place [the defendant] wanted to take somebody into custody is in the middle of a busy street." The victim then raised his hands and surrendered.

Upon reaching the victim's location at the center of the road, the defendant took hold of the victim and attempted to move him to the side of the road to arrest and to handcuff him. To move the victim, the defendant changed the position he used to hold his weapon. Consistent with his training, the defendant held his weapon in his right hand, which he held close to the center of his body, while holding his empty left hand out straight to take hold of the victim. The purpose of that change in position was to maximize the distance between the weapon and the victim.

The defendant led the victim back to the same grassy area next to the road. Upon arriving at the grassy area, the victim initially lay down on his back and elbows with his feet pointed toward the road, and then lay on his stomach with his hands pointed straight over his head. The defendant straddled the victim, standing over him with his gun pointed at his back. At some point, the defendant placed his left foot on the victim's back. The defendant used his left hand to take the victim's hands and secure them behind his back. None of the witnesses that testified at trial observed a struggle between the defendant and the victim. Moments later, the defendant then fired his weapon once at the victim, killing him. After the defendant shot the victim, witnesses observed the victim lying on the ground with his hands out in front of him.

The state police investigated the incident and, pursuant to a search and seizure warrant, seized articles of clothing from the defendant's home. Among those items were the pants that the defendant was wearing during

the incident. Robert O'Brien, a forensic criminalist with the office of the chief medical examiner, concluded that the defendant's left pant leg contained a particle consistent with gunshot residue. William Bodziak, a footwear impressions expert, concluded that a discoloration pattern on the victim's shirt correlated in size and shape with the boots that the defendant wore at the time of the incident. Virginia Maxwell, a criminologist with the state forensic science laboratory conducted tests on the victim's clothing. She found no concentrations of mud or other vegetative materials on the victim's pants beneath his knees. An examination of the pockets of the jacket that the victim had in his possession revealed a folding knife with a blade approximately 2.75 inches in length. Additional facts will be set forth as necessary.

I

The defendant first claims that the evidence adduced at trial was insufficient to establish his guilt of the crime of manslaughter in the first degree with a firearm in violation of § 53a-55a. We disagree.

As a preliminary matter, we note that in light of our resolution of the defendant's claim pertaining to the denial of his right to present a defense, we will not address every claim that he has raised. Nevertheless, "[w]e must address the sufficiency of the evidence claim since the defendant would be entitled to an acquittal of the charge on which he claims insufficient evidence if he prevails on his claim." *State* v. *Williams*, 39 Conn. App. 18, 23–24, 663 A.2d 436 (1995), rev'd on other grounds, 237 Conn. 748, 679 A.2d 920 (1996); *State* v. *Dunn*, 26 Conn. App. 114, 123, 598 A.2d 658 (1991).

We begin by setting forth our well established standard of review for claims challenging the sufficiency of the evidence. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the

evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Additionally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier of fact's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *McMahon*, 257 Conn. 544, 566–67, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002).

We also note that for the purposes of sufficiency review after concluding that a new trial is required, we review the sufficiency of the evidence as the case was tried; in other words, we review the evidence in its

improperly restricted state, impropriety notwithstanding. "Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error." *State* v. *Carey*, 228 Conn. 487, 496, 636 A.2d 840 (1994); see also *State* v. *Rodriguez*, 39 Conn. App. 579, 592–93, 665 A.2d 1357 (1995) (reviewing all evidence in addressing sufficiency of evidence claim, including improperly admitted evidence, after ordering remand because trial court failed to suppress evidence), rev'd on other grounds, 239 Conn. 235, 684 A.2d 1165 (1996). "A reversal for trial error does not mean that the state has failed to prove its case but is a determination that a defendant was convicted in a defective process . . . ." (Citation omitted.) *State* v. *Wright*, 47 Conn. App. 559, 564, 707 A.2d 295, cert. denied, 244 Conn. 917, 714 A.2d 8 (1998). Accordingly, a claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial. We therefore review the evidence in the present case as the case was tried.

The defendant argues that the state failed to satisfy two distinct burdens. First, the defendant argues that the state failed to prove, beyond a reasonable doubt, one of the essential elements of the crime of manslaughter in the first degree with a firearm. Second, the defendant argues that the state failed to disprove his theory of justification, in this case, self-defense pursuant to General Statutes § 53a-22. We address each of those arguments in turn.

To obtain a manslaughter conviction under §§ 53a-55 (a) (1) and 53a-55a, the state must prove that the defendant, (1) with the intent to cause serious physical injury to another person, (2) caused the death of such person or a third person (3) using, or threatening to use by displaying or representing by his words or conduct, that he possesses a firearm. "The intent to cause serious physical injury required for a conviction of man-

slaughter in the first degree under § 53a-55 (a) (1), by definition, required a jury's finding that the defendant caused a physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of a bodily organ." (Internal quotation marks omitted.) *State* v. *James*, 54 Conn. App. 26, 30–31, 734 A.2d 1012, cert. denied, 251 Conn. 903, 738 A.2d 1092 (1999).

The defendant concedes that "[he] caused the death of [the victim] and that he did so by use of a firearm." The defendant does dispute, however, his mental state at the moment he fired the single fatal shot into the victim's back. Accordingly, we need only review the evidence adduced at trial to determine whether the jury reasonably could have concluded by proof beyond a reasonable doubt that the defendant, at the time of the incident, intended to cause the victim serious physical injury.

"A person's intent is to be inferred from his conduct and the surrounding circumstances and is an issue for the [trier of fact] to decide." (Internal quotation marks omitted.) *State* v. *Nosik*, 245 Conn. 196, 208, 715 A.2d 673, cert. denied, 525 U.S. 1020, 119 S. Ct. 547, 142 L. Ed. 2d 455 (1998). "[A] factfinder may infer an intent to cause serious physical injury from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *State* v. *James*, supra, 54 Conn. App. 31. "Because direct evidence of the accused's state of mind is rarely available, intent is often inferred from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." *State* v. *Sanders*, 54 Conn. App. 732, 738, 738 A.2d 674, cert. denied, 251 Conn. 913, 739 A.2d

1250 (1999), citing *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994).

In the present case, mindful that we view the evidence in a light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the defendant intended to cause the victim's death. The defendant, citing his trial testimony, concedes that he "fired the shot to disable [the victim] . . . ." He further concedes that "it is certainly possible, and maybe even probable, that the defendant's 'conscious objective' was to [cause a serious physical injury]." The jury was entitled to credit the defendant's testimony concerning his intent to disable the victim and the possibility or probability that his objective in shooting the victim was to cause a serious physical injury. Moreover, Connecticut case law clearly permits a jury to infer intent based solely on the undisputed facts of the case, let alone other testimony and evidence that the parties dispute. See *State* v. *Sanders*, supra, 54 Conn. App. 739 (reasonable to infer intent to cause serious physical injury to person where defendant fired gun at that person); *State* v. *Toczko*, 23 Conn. App. 502, 509, 582 A.2d 769 (1990).

Despite the undisputed evidence and his concession as to the "possibility" that he possessed the requisite intent, the defendant argues that "possibilities and probabilities are not enough" to satisfy the state's burden of proving the requisite intent beyond a reasonable doubt. In support of his argument, the defendant cites *State* v. *Maselli*, 182 Conn. 66, 68, 73, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981). In that case, the state adduced evidence showing that that defendant shot at a victim six to eight times, killing the victim. The state charged the defendant with murder. The jury returned a verdict of guilty on the lesser included offenses of manslaughter in the first degree pursuant to §§ 53a-55 (a) (1) or 53a-55 (a) (3) without specifying on which subsection it

relied. In reviewing the defendant's claim that the trial court improperly instructed the jury on the applicable lesser included offenses, the Supreme Court stated in dicta that "[t]he jury might well have concluded that for the defendant to have believed under the circumstances revealed by the evidence that the victim was about to use deadly force upon him so that it was necessary to fire eight shots at point blank range was such a gross deviation from the standard of conduct that a reasonable person would observe in the situation as to constitute recklessness." Id., 73.

The fact that a different jury may have returned a different verdict on the same or similar facts does not render the jury's verdict void or irreconcilable with the facts. As our Supreme Court has stated: "The fact that the evidence was disputed or that other inferences could have been drawn is not relevant to our review. As long as evidence existed from which the jury reasonably could have found the facts and drawn the inferences leading to its guilty verdict, it is our obligation to defer to those findings and inferences in passing on this sufficiency challenge." (Internal quotation marks omitted.) *State* v. *Torres*, 242 Conn. 485, 501, 698 A.2d 898 (1997); see also *State* v. *Jackson*, 257 Conn. 198, 205, 777 A.2d 591 (2001) (reviewing court cannot substitute its judgment for that of jury if there is sufficient evidence to support jury's verdict). Construing the evidence in the light most favorable to sustaining the verdict, as we must, we conclude that the jury reasonably could have concluded that the cumulative force of the evidence established the defendant's intent to cause the victim serious physical injury beyond a reasonable doubt.

We next address the defendant's challenge to the sufficiency of the evidence pertaining to his defense under § 53a-22. At trial, the defendant claimed that he was acting in self-defense when he shot the victim. "Self-defense is raised by way of justification, and when

such defense is asserted 'the state shall have the burden of disproving such defense beyond a reasonable doubt.' General Statutes § 53a-12 (a) . . . ." (Citations omitted.) *State* v. *Gelormino,* 24 Conn. App. 556, 561, 590 A.2d 476, cert. denied, 219 Conn. 913, 593 A.2d 138 (1991). "Whether the defense of the justified use of [deadly] force, properly raised at trial, has been disproved by the state is a question of fact for the jury, to be determined from all the evidence in the case and the reasonable inferences drawn from that evidence. . . . As long as the evidence presented at trial was sufficient to allow the jury reasonably to conclude that the state had met its burden of persuasion, the verdict will be sustained." (Internal quotation marks omitted.) *State* v. *Hallowell,* 61 Conn. App. 463, 470, 766 A.2d 950 (2001).

A police officer is justified in using deadly physical force under the relevant self-defense statute, § 53a-22,[4]

---

[4] General Statutes § 53a-22, entitled "[u]se of physical force in making arrest or preventing escape," provides in relevant part:

"(a) For purposes of this section, a reasonable belief that a person has committed an offense means a reasonable belief in facts or circumstances which if true would in law constitute an offense. If the believed facts or circumstances would not in law constitute an offense, an erroneous though not unreasonable belief that the law is otherwise does not render justifiable the use of physical force to make an arrest or to prevent an escape from custody. A peace officer . . . who is effecting an arrest pursuant to a warrant or preventing an escape from custody is justified in using the physical force prescribed in subsections (b) and (c) of this section unless such warrant is invalid and is known by such officer to be invalid.

"(b) Except as provided in subsection (a) of this section, a peace officer . . . is justified in using physical force upon another person when and to the extent that he reasonably believes such to be necessary to: (1) Effect an arrest or prevent the escape from custody of a person whom he reasonably believes to have committed an offense, unless he knows that the arrest or custody is unauthorized; or (2) defend himself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape.

"(c) A peace officer . . . is justified in using deadly physical force upon another person for the purposes specified in subsection (b) of this section only when he reasonably believes such to be necessary to: (1) Defend himself or a third person from the use or imminent use of deadly physical force;

only when (1) he reasonably believes such force to be necessary (2) to defend himself or a third person from the use or imminent use of deadly physical force.

Although the defendant notes that the appellate courts in this state have not defined the specific test for evaluating self-defense under § 53a-22, both the defendant and the state assert that the jury must apply the two part, or "subjective-objective," test used in evaluating self-defense claims under General Statutes § 53a-19. See *State* v. *Prioleau*, 235 Conn. 274, 286, 664 A.2d 743 (1995). We agree that the reasonableness of the defendant's belief under § 53a-22 should be evaluated pursuant to the subjective-objective formulation. Under that test, the jury must first determine whether, on the basis of all the evidence, the defendant in fact honestly believed that deadly force, rather than some lesser degree of force, was necessary to repel the victim's alleged attack. See id. If the jury determines that the defendant honestly believed that deadly force was necessary, it then turns to the second, or "objective," part of the test. Here, the jury's inquiry requires it to determine whether the defendant's honest belief was reasonable.[5]

or (2) effect an arrest or prevent the escape from custody of a person whom he reasonably believes has committed or attempted to commit a felony which involved the infliction or threatened infliction of serious physical injury and if, where feasible, he has given warning of his intent to use deadly physical force. . . ."

[5] The objective part of the test under General Statutes § 53a-19 requires the jury to measure the defendant's honest belief against the standard of a reasonable person in the defendant's circumstances. *State* v. *Prioleau*, 235 Conn. 287. As we will discuss, we agree with the defendant that in addressing the objective part of the test under General Statutes § 53a-22, however, the standard is that of a reasonable *peace officer*. As we will discuss, we conclude that the evidence adduced at trial, when viewed in a light most favorable to sustaining the jury's verdict, was sufficient to disprove the elements of § 53a-22 even under the "reasonable peace officer" standard. We note, however, that at the new trial, the defendant may introduce additional evidence supporting his claim that he was justified in using deadly force according to the standard articulated in this opinion. Accordingly, we express no opinion as to whether the state's evidence will be sufficient to disprove the defendant's justification defense at that time.

See id., 287. The defendant maintains that the state failed to introduce sufficient evidence to disprove beyond a reasonable doubt the elements of self-defense as set forth in § 53a-22.

The evidence was sufficient to permit the jury to conclude beyond a reasonable doubt that the state disproved the elements of § 53a-22. The defendant's attempt to show that his belief that deadly force was necessary and therefore reasonable depends in large part on his testimony that the victim refused to show his hands.[6] The jury was, however, entitled to believe other testimony contradicting the defendant's account

---

[6] During direct examination by defense counsel, the defendant testified in relevant part:

"Q. If someone were to say to you, why didn't you just holster your gun and just handcuff him?

"A. At that point, it would have been suicidal on my part.

"Q. Why?

"A. I can't see his hands. The hands kill, plain and simple. You are not—I'm, until you can see those hands are clear of weapons, you do not holster your weapon. He could very easily pull a concealed weapon or already have weapon, turn around and stab and shoot me. That would be absolutely ludicrous to do, at that point.

"Q. You see the movement you have described; what happens next?

"A. His hands are moving quickly. I'm still yelling, 'Show me your hands, show me your hands.' Now, I'm thinking this is going bad. I'm really scared. I can't see his hands. What's he doing? He is not responding to any of my commands. He has just run through two lanes of traffic. My previous knowledge of him is all coming into play. I'm like, what is he doing? Just show me your hands. And he moved very suddenly up toward me, and I believe he starts to twist toward the left with his left arm coming out.

"Q. And what did you do when you saw that?

"A. Well, like I said, I was scared to death at this point, when he made that, what I'll call classic move, that very sudden movement toward me. . . .

"Q. Did you believe he had obtained a weapon and was about to use it on you?

"A. Absolutely.

"Q. What did you do?

"A. I fired my gun one time. . . .

"Q. You fired one shot. What happened?

"A. He fell to the ground, didn't see—he wasn't moving. I couldn't believe what had just happened to me. I saw that he wasn't moving."

of the incident. For example, two witnesses, William Eayrs and Abu Nassir, testified that when the defendant drew his service revolver and pointed it at the victim, the victim, who was standing in the middle of the road at the time, raised his hands over his head. Nassir also testified that even after the defendant subdued the victim, forcing him to lie on the embankment, he saw the victim with his hands up while the defendant pointed his own hands out in front of him. Gail Meehan, who was driving by the location of the incident with her family, testified that she saw the defendant standing over the victim with the victim's hands secured behind his back by the defendant's left hand. Meehan testified that, at that time, the victim, alive, turned his head toward her with his eyes open and that she looked at him.[7] That testimony directly contradicted the defen-

---

[7] During direct examination by the prosecutor, Meehan testified in relevant part:

"Q: Now, tell us what you saw.

"A. I recall once we got closer to it, because I was still looking back, once we got closer to it and I was a little more parallel, I realized that it was, in fact, an officer, and I assumed that whoever he had apprehended was the one on the ground.

"Q. Okay. The person on the ground: Man, woman, child?

"A. It looked like a young adult.

"Q. Black, white, Hispanic?

"A. I didn't realize at first until I saw—when I saw, only saw the back of the head, which I thought was a woolen cap. When his head turned, I realized it was a black male.

"Q. Tell us how the black male was lying?

"A. He was on his stomach, the plainclothes officer was over him. He had his left foot on his back, and the boy on the ground had his hands behind him secured by the officer's left hand. . . .

"Q. Now, the black man is lying on the ground. Where are his feet?

"A. Lying flat.

"Q. In relationship to [Route] 202?

"A. Straight across, diagonal across.

"Q. And you said at one point in time, you saw his head move, and that is when you realized it was a black male?

"A. Yes, yes.

"Q. Okay.

"A. He was turned away from me.

"Q. Correct.

dant's testimony concerning the events leading to the shooting.

"It is the jury's right to accept some, none or all of the evidence presented." *State* v. *Byrd,* 34 Conn. App. 368, 384, 641 A.2d 818 (1994), aff'd in part, 233 Conn. 517, 659 A.2d 1201 (1995). From those and other facts, and the jury's right to reject any or all of the defendant's evidence, we conclude that the jury was free to disbelieve his claim of self-defense and to conclude beyond a reasonable doubt that he could not reasonably have believed that he was faced with an imminent use of physical force by the victim or that deadly physical force was necessary to defend himself against the victim.

On the basis of the evidence and the reasonable and logical inferences to be drawn therefrom, and construing the evidence in a light most favorable to sustaining the jury's verdict of guilty, we conclude that the cumulative effect of the evidence was sufficient to support the jury's conclusion that the state had met its burden of disproving the defense of justification.

## II

The defendant next claims that the court improperly excluded certain evidence, thereby depriving him of his right to present a defense under the sixth amendment to the United States constitution[8] and the due process

"A. And he went—as soon as I came right across from him, at that point is when his head turned and I looked right at him.

"Q. You looked right at him?

"A. Yeah.

"Q. He moved? He was alive?

"A. Yes. I saw his eyes."

[8] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

clause of article first, § 8, of the constitution of Connect-
icut.[9] Specifically, the defendant argues that the court's
ruling excluding the proposed testimony of three expert
witnesses, certain police academy training videos, and
evidence and testimony relating to the victim's record
of criminal convictions prevented the defense from
introducing evidence relevant to the theory of self-
defense pursuant § 53a-22. The defendant argues that
this evidence was admissible to show the objective
reasonableness of his belief that the use of deadly force
was justified, judged against the "reasonable peace offi-
cer" standard. We agree.

The following additional facts and procedural history
are necessary for our resolution of the defendant's
claim. The defendant sought to introduce the testimony
of three expert witnesses. One of those witnesses, Regi-
nald F. Allard, Jr., had been an instructor at the Connect-
icut Police Academy for approximately sixteen years.
Allard instructed the defendant at the police academy,
both in the classroom and in practical skills. The defen-
dant also offered the expert testimony of David M.
Grossi, Sr., a former police officer and an instructor on
police use of force and a lecturer on police use of force
issues, and Emanuel Kapelsohn, who is certified by
the Federal Bureau of Investigation (FBI) as a police
firearms instructor, and who lectures on weapons and
police use of force issues. Essentially, the defendant
offered the testimony of those witnesses to allow the
jury to evaluate the defendant's conduct against that
of a reasonable police officer.

---

[9] The constitution of Connecticut, article first, § 8, provides in relevant
part: "In all criminal prosecutions, the accused shall have a right to be heard
by himself and by counsel; to be informed of the nature and cause of
the accusation; to be confronted by the witnesses against him; to have
compulsory process to obtain witnesses in his behalf . . . and in all prosecu-
tions . . . to a speedy, public trial by an impartial jury. No person shall be
compelled to give evidence against himself, nor be deprived of life, liberty
or property without due process of law . . . ."

In his memorandum of law in support of the admissibility of the expert witnesses' testimony, the defendant argued that their testimony would support his contention that his actions, including the shooting that led directly to the victim's death, were justified and that his belief that deadly force was necessary comported with the reasonable police officer standard.

The defendant first noted in his legal memorandum that the court in the probable cause hearing had stated that the evidence, including some of the testimony of Allard, might be relevant for the purpose for which it was offered.[10] The defendant then reviewed the law pertaining to the admissibility of expert testimony. "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Billie*, 250 Conn. 172, 180, 738 A.2d 586 (1999). Addressing in his legal memorandum the elements of the test for admissibility of the expert testimony, the defendant argued for the admissibility of the testimony of Allard, Grossi and Kapelsohn as follows:

---

[10] We note that the defendant, in his challenge to the court's finding of probable cause for the state to charge him with murder pursuant to General Statutes § 53a-54, also attempted to introduce, inter alia, the testimony of Allard on the subject of whether the defendant's use of deadly force was reasonable. In rejecting the proffered evidence, the court noted that some of that evidence "may well be relevant to the defense under General Statutes § 53a-22 that would be raised at trial." The court also noted that although the substantive law in cases cited by the defendant in discussing federal rulings under 42 U.S.C. § 1983 may apply to the defense under § 53a-22, that law "serves no purpose in the procedural context of this probable cause hearing to determine *the objective reasonableness* under the fourth amendment *of the defendant's use of deadly force.*" (Emphasis added.) Finally, the court concluded that "[t]he proffered evidence may show that the defendant was justified in using deadly force under . . . § 53a-22 (c), but consideration of that evidence for that purpose is for the trier of fact in this case."

*"A. The Defendant's Expert Witnesses Have a Special Skill or Knowledge Directly Applicable to the Matter in Issue in this Case.* The defendant has introduced to prospective jurors the names of three people he intends to call as expert witnesses in this case [Allard, Grossi and Kapelsohn]. These three witnesses have special skills and knowledge on critical issues to be decided by the jury in this case relating to the defendant's justification/self-defense claim.

"Mr. Allard has been an instructor of police recruits at the Connecticut Police Academy since December 1984. He was [the defendant's] instructor, both in the classroom and in practical skills in several areas including police use of force, police defensive tactics, mechanics of arrest and firearms. He will testify to classroom instruction and videotapes that [the defendant] and his classmates viewed at the Academy concerning police use of force.

"Mr. Allard was also a member of the New Britain Police Department between 1973 and 1984, achieving the rank of Sergeant and was also a member of the Woodbridge Police Department for approximately six months achieving the rank of lieutenant. He has testified as an expert witness many times on issues related to police use of force in federal and state courts in Connecticut and in state court in New York.

"David Grossi has a [bachelor of arts degree] in Police Administration. He was a police officer in New York between 1970 and 1990 achieving the rank of Lieutenant and has been an instructor for Calibre Press Incorporated, since 1990. He has lectured throughout the United States on police use of force issues. He is the author of numerous articles on police use of force issues. He has testified as an expert witness in federal and state courts in several cases on police use of force issues.

Two of the videotapes viewed by [the defendant] were produced by Calibre Press Incorporated.

"Emanuel Kapelsohn has a [bachelor of arts degree] from Yale [University] and [a juris doctor degree] from Harvard Law School. He is certified by the FBI as a police firearms instructor and has lectured throughout the United States and Europe on firearms and police use of force issues.

"He has testified as an expert witness in approximately twenty cases—both criminal and civil—involving police use of force since 1985 in state and federal courts, including Connecticut. He has been retained by the United State Department of Justice as an expert witness in a case involving a person shot by police who was in possession of a knife in front of the White House.

"He is the author of numerous articles involving firearms and other weapons and police use of force.

"*B. The Expert's Skill or Knowledge is not Common to the Average Person.* During the voir dire of prospective jurors, [defense counsel] asked each person whether he or she either had been a police officer or had ever received police training. All prospective jurors answered they had not.

"The defendant will testify in this case. Consistent with his claim of justification/self-defense, he will testify to the training he received at the Connecticut Police Academy in such areas as the mechanics and laws of arrest, firearms training, police defensive tactics, police use of force, police use of deadly force, and judicial decisions concerning police use of force. He will also testify that while at the Academy he viewed approximately four (4) videotapes concerning police use of force.

"This testimony of these witnesses will clearly concern '. . . a view into a world that might be unknown

to the average juror.' *State* v. *Correa*, 241 Conn. 322, 355 [696 A.2d 944] (1997). Their testimony is also relevant to the defendant's claim of self-defense. See *State* v. *Borrelli*, 227 Conn. 153, 170 [629 A.2d 1105] (1993), where the Court held that expert testimony concerning battered women's syndrome is admissible for a number of reasons including when '. . . offered by a criminal defendant to bolster a claim of self-defense.'

"*C. The Testimony will be Helpful to the Jury in Considering the issues.* Mr. Allard's testimony will assist the jury by informing them of the training he provided to [the defendant] and other police recruits in the areas previously specified.

"Messrs. Grossi and Kapelsohn's testimony will assist the jury by informing them of the many factors a *reasonable police officer* must consider when determining whether to use force and, if so, the degree of force to by used.

"It would be ironic indeed if a police officer charged with murder and facing a sentence of life in prison is barred from presenting expert testimony but a pornographer facing a far lesser sentence can introduce expert testimony on the issue of obscenity, Connecticut General Statute § 53a-204, or a person charged with speeding and facing only a fine can introduce expert testimony concerning speeding. *State* v. *Tomanelli*, 153 Conn. 365, 370 [216 A.2d 625] (1966)." (Emphasis added.)

In his offer of proof, the defendant reiterated the basis for admitting the expert testimony. He emphasized that Allard was the defendant's "primary firearms instructor . . . both for lectures and actual firearms—what they call practical skills exercises, where police officers go to a gym and are taught various things concerning police use of force and defensive tactics, and police use of

deadly force, handgun retention, maybe, hopefully, prevent an assailant from grabbing an officer's gun.

* * *

"[I]t's my position [that] I ask to present Mr. Allard, Your Honor, that in the same way that my client is entitled to testify to the training he received that relates to the issues during this case, it's not limited to the trainee, but Mr. Allard, being the trainer, should also be permitted to testify. He is the person who actually instructed in these areas . . . .

"[I]n one section of my memorandum of law, I cited a number of federal cases [under 42 U.S.C. § 1983] wherein, in one federal prosecution, expert police testimony was permitted concerning the training police officers received as standards in the trade, if I can term it that, that officers received, and the court ruled basically question by question as to what areas of testimony were admissible, what were not. Obviously, my purpose in having Mr. Allard testify would not be to the ultimate issue to be determined by the jury . . . .

"[A]ll of these [federal] cases [cited in the defendant's memorandum of law] address that particular issue, namely, not only the officer charged testifying to his training, but the training officer also testifying as it is relevant to issues such as state of mind, who is the aggressor in a given case, appropriate use of force, the continuum of force, etc. So, that would be my offer of proof as to Mr. Allard. His testimony would be probative, not prejudicial. I think it would, to borrow a phrase from all the cases we looked at, keeping this in mind that although these jurors said none of us have been police officers, none of us ever received police training, it would permit them to see firsthand the person who trained [the defendant]."

In its memorandum of decision[11] dated March 3, 2000, the court ruled that it would not permit expert testimony on the use of deadly force. The court excluded the testimony of two of the witnesses, Allard and Grossi, and admitted the testimony of Kapelsohn on a limited basis. The court concluded that Kapelsohn's testimony would cover the allowable testimony and excluded the rest of the proffered testimony on the ground that it was cumulative. The court concluded its ruling by noting that it did not foreclose the possibility that other evidence would be admitted at trial. In fact, the defendant did testify concerning many of the same areas about which Kapelsohn offered his opinion.

On appeal, the defendant argues that the court's ruling prevented him from putting on evidence crucial to self-defense in that the court refused to allow testimony on the training the defendant received in self-defense. Specifically, he argues that in excluding the testimony of Allard and Grossi in their entirety, as well as all evidence relating to the defendant's training and police training in general regarding the use of deadly force, the court prevented the defendant from introducing evidence that was highly relevant to establishing that his use of deadly force was objectively reasonable

---

[11] In its memorandum of decision on the defendant's motion to admit the testimony of the expert witnesses, the court stated in relevant part: "Expert testimony is used in a trial to explain to a jury matters which require information beyond the knowledge of the average citizen-juror. Accordingly, it is not unusual to have scientific experts explain what caused a person's death, an automobile to malfunction or a plane to crash.

"Expert testimony is *not* used in a trial when it is not *necessary* that the jury require any more knowledge than the average citizen-juror possesses in order to decide an issue at that trial.

"Here, the defendant proposes to present three expert witnesses generally on the subject of police training in the use of force as it may relate to the state of mind of the defendant . . . . (In fact, the proposed testimony actually goes so far as to recite the expert's opinion as to the guilt or innocence of [the defendant]. This court knows of no instance where this has ever been allowed.)" (Emphasis in original.)

according to the "reasonable police officer" standard. The evidence, the defendant argues, would have assisted the jury in analyzing the defendant's state of mind and his conduct during the forty seconds that elapsed between the time when he first encountered the victim and when he fired the shot that killed the victim. We agree.

It is well established that a trial court has broad discretion in ruling on evidentiary matters. *State* v. *Cerreta*, 260 Conn. 251, 260, 796 A.2d 1176 (2002). If the improper exclusion of evidence implicates a defendant's constitutional right to present a defense, "the burden falls on the state to demonstrate that the error was harmless beyond a reasonable doubt." *State* v. *Carter*, 228 Conn. 412, 428, 636 A.2d 821 (1994).

"The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, an accused must comply with established rules of procedure and evidence in exercising his right to present a defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, supra, 260 Conn. 260–61.

Two statutes, §§ 53a-19 and 53a-22, authorize the use of deadly force in self-defense. Section 53a-19, the civilian, or nonpeace officer self-defense statute, is entitled "[u]se of physical force in defense of person." It provides in relevant part for the use of deadly force in self-

defense, with several relevant exceptions that we note, as follows: "[*A*] *person* is justified in using . . . deadly physical force [only if] the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm." (Emphasis added.) General Statutes § 53a-19 (a).

The use of deadly force by persons other than peace officers is specifically proscribed in other subsections of § 53a-19. Subsection (b) provides: "Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the *actor shall not be required to retreat* if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or *if he is a peace office or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22*, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform." (Emphasis added.)

Subsection (c) of § 53a-19 provides: "Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the

product of a combat by agreement not specifically authorized by law."

Section 53a-22, entitled "[u]se of physical force in making arrest or preventing an escape," applies to peace officers. It provides in relevant part: "A *peace officer* . . . is justified in using deadly physical force upon another person [to effectuate an arrest or to prevent an escape, or to defend himself or a third person from the use or imminent use of physical force while doing so] only when he reasonably believes such to be necessary to: (1) Defend himself or a third person from the use or imminent use of deadly physical force; or (2) effect an arrest or prevent the escape from custody of a person whom he reasonably believes has committed or attempted to commit a felony which involved the infliction or threatened infliction of serious physical injury and if, where feasible, he has given warning of his intent to use deadly physical force." (Emphasis added.) General Statutes § 53a-22 (c).

We conclude that the test for evaluating self-defense claims pursuant to § 53a-22 is a subjective-objective test. The jury is required, first, to determine whether the defendant honestly believed that the use of deadly force was necessary in the circumstances. If, however, the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determination as to whether that belief was reasonable, from the perspective of a reasonable police officer in the defendant's circumstances. See *Graham* v. *Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (evaluating reasonableness of police officer's belief that deadly force justified in context of fourth amendment excessive use of force claims, stating that "[t]he [objective] reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hind-

sight"); *Weyel* v. *Catania*, 52 Conn. App. 292, 296, 728 A.2d 512 (all claims that law enforcement officers have used excessive force in course of arrest, whether deadly force or not, should be analyzed under reasonableness standard of fourth amendment), cert. denied, 248 Conn. 922, 733 A.2d 846 (1999).[12]

With that standard in mind, we now turn to the exclusion of testimony offered by the defendant in support of his defense. As previously noted, the defendant offered the testimony of three expert witnesses to establish the objective reasonableness of his belief that deadly force was necessary under the circumstances. The court excluded evidence on several grounds. Certain testimony was excluded on the ground of relevance, other testimony was excluded on the ground of cumulativeness, and other testimony was excluded on the ground that it improperly would invade the province of the jury.

In determining whether expert testimony on the use of force by a police officer is properly admissible under the appropriate standard, we note that "[a]s a general proposition, the 'objective reasonableness' standard may be comprehensible to a lay juror. On the other hand, any 'objective' test implies the existence of a standard of conduct, and, where the standard is not defined by the generic—a reasonable person—but rather by the specific—a reasonable officer—it is more likely that [federal rule of evidence] 702's line between common and specialized knowledge has been crossed." *Kopf* v. *Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993) (analyzing plaintiff's claim that court improperly excluded

---

[12] Although the defendant in his principal brief argues for the "reasonable police officer standard" in support of his jury instruction claim, we agree with him that if he were to be sued for damages under 42 U.S.C. § 1983, he would be entitled to have his civil jury instructed under the *Graham* standard. Thus, he argues, it would be anomalous to extend *less* protection to him at his criminal trial, where his liberty is at stake.

expert testimony concerning defendant's use of non-deadly force in effecting arrest). In *Kopf*, the United States Court of Appeals for the Fourth Circuit stated that "[w]here force is reduced to its most primitive form—the bare hands—expert testimony might not be helpful. Add handcuffs, a gun, a slapjack, [M]ace, or some other tool, and the jury may start to ask itself: what is [M]ace? what is an officer's training on using a gun? how much damage can a slapjack do? Answering these questions may often be assisted by expert testimony." Id., 379. We find that reasoning persuasive in the case at hand.

In this case, however, the court excluded all evidence on the use of deadly force by a police officer. At the outset, the court stated in its memorandum of decision: "A central issue for this jury is to decide is if [the defendant] was justified in using deadly force upon [the victim] because he reasonably believed deadly force was necessary to defend himself from the use, or imminent use, of deadly force by [the victim].

"That central issue can be decided by jurors without the resort to the testimony of expert witnesses as to what [the defendant's] beliefs were at the time of the incident. A person's 'belief,' like 'intent,' has always been determined by a jury by listening to the testimony of the defendant . . . and by evaluating the circumstances surrounding the incident as presented in other testimony and exhibits and, therefrom, determine what his belief or intent was.

"For the court to rule otherwise would constitute an improper invasion of the exclusive province of the jury to find the facts and the court to state and apply the applicable principles of law."

The court concluded that of the proffered testimony on the allowable subjects, Kapelsohn's testimony would suffice because the court was "not inclined to hear

cumulative evidence . . . ." The court, furthermore, excluded all expert testimony regarding the use of deadly force by a police officer and all of Allard's testimony, including the only corroborative testimony on the training the defendant actually received. The exclusion of all of Allard's testimony and all testimony concerning the use of deadly force in self-defense by a police officer constituted an abuse of discretion.

The state argues that the testimony properly was excluded, as it went to the defendant's state of mind, thus infringing on the jury's ability to resolve the ultimate question of the defendant's guilt or innocence. That argument misses the point. The defendant's state of mind in general, or the defendant's beliefs at the time of the incident are, indeed, the subject of the jury's inquiry. The jury was entitled to hear the relevant evidence offered to the extent that it would have assisted the jury in determining the issues. See *State* v. *Billie*, supra, 250 Conn. 180. The issues concerned the defendant's state of mind, e.g., whether his belief, was (1) honest and (2) reasonable according to the test previously discussed.

Allard's testimony regarding the training that the defendant received on the use of deadly force was relevant to the defense. It did not invade the province of the jury on the ultimate issue of fact. Rather, it would have permitted the defendant to establish his defense by assisting the jury in evaluating whether his beliefs did in fact comport with the standard of a reasonable peace officer.

If the improperly excluded evidence may have had a tendency to influence the judgment of the jury, its exclusion cannot be considered harmless. *State* v. *Carter*, supra, 228 Conn. 428. In these circumstances, we cannot conclude that the exclusion of the expert testimony regarding the defendant's training in the use of

deadly force was harmless beyond a reasonable doubt. The defendant, therefore, is entitled to a new trial, and we remand the case to the trial court for that purpose.[13]

[13] The defendant also sought to introduce four police training videos. They were titled "Deadly Force," "Miami Firefight," "Ultimate Survivors" and "Surviving Edged Weapons." The court reviewed each video and excluded all of them. The court found that the scenario in the "Deadly Force" video involved facts that differed significantly from those in the case at hand. The court also noted that the attorneys on both sides agreed that this case was "not generally comparable to the scenes shown in [the] video." The court further noted that the videos were inflammatory and occasionally prejudicial to both sides.

After reviewing the "Miami Firefight" video, the court stated that it involved a "reenactment of a shootout between approximately eight FBI agents and two armed bank robbers." The court concluded that this video was irrelevant to the issues in the case at hand. The court also reviewed the "Ultimate Survivors" video and found it to be irrelevant. Although the court concluded that the four stories in the videos of police officers surviving violent confrontations with citizens were fascinating, they were not relevant to the issues in the case at hand. Finally, the court recounted its review of "Surviving Edged Weapons," and concluded that it was "not relevant to the claims in this case, and would have confused and distracted the jury."

In concluding its ruling, the court further articulated the grounds on which it excluded all of the videos. It characterized the videos as "inflammatory, imbalanced, graphic and too emotion laden for laypersons. . . . Thus, balancing the prejudicial value versus the probative value of the videotapes, the court excluded them from this trial."

The defendant also attempted to introduce testimony and other evidence concerning the victim's prior criminal convictions. On February 4, 2000, the defendant filed a memorandum of law in support of his claim for the admissibility of his testimony and that of other witnesses concerning the victim's two felony convictions, misdemeanor convictions for violence and reputation for violence. Specifically, the defendant attempted to persuade the court to admit the victim's record relating to convictions for assault in the second degree, sexual assault in the third degree, two misdemeanor convictions involving crimes of violence, breach of the peace and criminal mischief. The defendant also attempted to introduce evidence of the victim's failure to appear in court on two counts of violation of probation, the underlying charges being the two assault convictions, and the details of the arrest warrants. That evidence, the defendant argues, pertained to what he knew about the victim's reputation for violence.

The court ruled that some of the reputation and opinion testimony and other evidence was admissible as "generally relevant to the jury's determination of whether or not the defendant was justified in killing [the victim]." It excluded other evidence of specific acts because of conflict with the

## III

The defendant next claims that the court improperly denied his request to charge and improperly instructed the jury. Specifically, he argues that the court improperly instructed the jury on the subjective-objective inquiry that the jury used to evaluate the defendant's belief that deadly force was necessary. We agree. Because this issue is likely to arise at the new trial and is closely related to the claim on which we are reversing the judgment, we will discuss this claim to provide guidance to the court on remand.

The following facts are relevant to our resolution of the defendant's claim. On February 22, 2000, the defendant submitted a request to charge consistent with his conception of the test applicable to self-defense claims under § 53a-22. The proposed charge stated in relevant part that "[t]he amount and degree of force that the officer uses must be reasonable. It must be that degree of force that a reasonable police officer in the same circumstances, viewed from the perspective of the defendant, would use making an arrest." On March 7, 2000, the defendant filed a supplemental request to charge on self-defense, which replaced the earlier request. The second request, which discussed the subjective-objective formulation, stated in relevant part: "The . . . test is an objective test—was the defendant's belief reasonable under all the circumstances? The second test requires you to consider what a reasonable police officer finding himself in the same situation

---

general rule against evidence of specific acts. Finally, the court excluded the evidence concerning the victim's rearrest warrants with bonds of $205,000 issued in 1998 as a result of his failure to appear.

Because we are ordering a new trial, we need not review every challenge to the court's evidentiary rulings. We note, however, that the dispositive issue is whether the court, in making certain evidentiary rulings, violated the defendant's constitutional right to present a defense. Our conclusion demands that at the new trial, the evidence proffered at that time be evaluated in light of the standard we have elucidated.

as did the defendant would also conclude that defensive deadly physical force was necessary to defend himself against the use of offensive deadly physical force by his assailant."

The defendant also requested, apparently tracking language in *Graham* v. *Connor*, supra, 490 Conn. 386, that the court charge the jury that "[i]n determining whether the force exercised was reasonable, you should consider the facts and circumstances as you find them to be, including the severity of the crimes the officer was attempting to arrest the deceased for, whether the deceased posed an immediate threat to the safety of the police officer or others, and whether the deceased was actively resisting arrest at the time the force was used."

The court denied the requested charge. In addressing the objective part of the subjective-objective test, the court instructed the jury as follows: "Here, you must determine whether a reasonable person in the accused's circumstances would have reached the belief that he was actually confronted with such deadly force and was in imminent danger of death. So, it is both a question of what his belief was and whether it was a reasonable belief."

The defendant timely objected to the instructions and to the court's failure to give the requested instructions. The defendant argued that "the cases . . . cited to the court throughout the course of this trial and in my request to charge made it mandatory for the jury to be told [it] had to look at the objective test through the eyes of a reasonably objective police officer, not a reasonable person. [The charge as given] would be the appropriate language under § 53a-19, civilian self-defense, not under police self-defense or police use of force."

The relevant law in our state pertaining to jury instructions is clear. "[A] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. . . . A defendant who asserts a recognized legal defense, the availability of which is supported by the evidence, is entitled as a matter of law to a theory of defense instruction." (Citations omitted; internal quotation marks omitted,) *State* v. *Ash*, 231 Conn. 484, 492–93, 651 A.2d 247 (1994).

As discussed in part II, the test for determining whether a police officer's use of deadly force was reasonable is to be judged according to the subjective-objective formulation used in evaluating self-defense claims under § 53a-19. With respect to the objective part of the test, however, the reasonableness is to be judged from the perspective of a reasonable police officer. Here, the court refused to so instruct. On remand, and upon the proper factual showing at the trial warranting an instruction on self-defense, the court must instruct on self-defense under § 53a-22 consistent with the test elucidated in this opinion.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.