******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DOUGLAS R. BROWN ET AL., COADMINISTRATORS
(ESTATE OF FREDERICK DEVON MCALLISTER)
*v.* BRIDGEPORT POLICE DEPARTMENT ET AL.
(AC 35304)

Gruendel, Keller and Flynn, Js.

*Argued November 12, 2014—officially released January 20, 2015*

(Appeal from Superior Court, judicial district of
Fairfield, Radcliffe, J.)

*Antonio Ponvert III*, with whom was *Preston Tisdale*,
for the appellants (plaintiffs).

*Daniel J. Krisch*, with whom was *Betsy A. Edwards*,
associate city attorney, for the appellees (defendant
city of Bridgeport et al.).

*Opinion*

GRUENDEL, J. The plaintiffs, Douglas R. Brown and Carlonetta McAllister, coadministrators of the estate of Frederick Devon McAllister, appeal from the judgment of the trial court, rendered after a jury trial, in favor of the defendants, the city of Bridgeport and Brian Fitzgerald.[1] They claim that the court (1) improperly instructed the jury on General Statutes § 53a-22 (c) (2), and (2) abused its discretion in denying their motion to set aside the verdict due to the alleged misconduct of the defendants' counsel at trial. We disagree and, accordingly, affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following relevant facts. During roll call[2] on the afternoon of January 31, 2008, officers of the Bridgeport Police Department (department) received a flyer indicating that a black male named Justin Ellerbe was a "wanted" and "armed" person. The flyer included a photograph of Ellerbe, his date of birth, his approximate height and weight, and his connection to a "burgundy Suburban" sport utility vehicle (SUV) whose plate marking included "WOA." Fitzgerald, a sergeant with the department, was present at roll call and was on patrol from 2:30 p.m. until 10:30 p.m.

That evening, the department received an anonymous 911 call reporting that Ellerbe had just arrived at 185 Hewitt Street in Bridgeport in a maroon SUV. The caller also stated that the vehicle's license plate was "601 WOH" and that Ellerbe was brandishing a .50 caliber handgun in the street outside that residence. Numerous officers converged at 185 Hewitt Street, including Fitzgerald, who was acting as a patrol supervisor at that time. They observed an SUV matching the general description provided in the flyer and the 911 call, and thereafter conducted a consensual search of the property, but did not encounter anyone matching Ellerbe's description. As a result, all uniformed officers departed the area. Sergeant Carl Bergquist instructed an undercover officer, Detective William Reilly, to maintain surveillance of the SUV from an unmarked vehicle.

Later in the evening, Reilly saw two black males exit the house at 185 Hewitt Street and head toward the SUV. When one of those individuals entered the driver's side of the vehicle and began to drive away, Reilly notified Bergquist of this development. Bergquist then stated over the main police radio channel: "Be advised units in the area of Hewitt and Stratford Avenue, I have an undercover following that vehicle we were watching on Hewitt, just left the area. I will try and update you." At that time, Fitzgerald's shift had ended and he was working "an extra duty road job" on Barnum Avenue, which required the use of his marked police vehicle.[3] When he heard a subsequent police transmission indi-

cating that the SUV was headed in his general direction, Fitzgerald responded and proceeded down Barnum Street. As the SUV traveled north on Willow Street approaching the intersection with Barnum Street, it suddenly swerved toward the marked police vehicle, then accelerated through the intersection without stopping at the stop sign on Willow Street. At that time, Fitzgerald made eye contact with the driver and observed that "there was a black male driving the car and based on the wanted poster I had seen earlier in the day, the driver looked like Justin Ellerbe."

Fitzgerald thus turned onto Willow Street and activated his vehicle's lights behind the SUV to effectuate a motor vehicle stop. The driver nonetheless refused to stop the SUV and continued north on Willow Street. When the SUV approached an intersection with Claremont Street, the driver once again drove through a stop sign without any attempt to slow or stop the vehicle. The SUV continued in a northerly direction, then cut through a pharmacy parking lot, where it jumped the curb and proceeded onto Carnegie Street. The SUV then crossed over to Grandfield Avenue, crashed through a chain-link fence and drove into a field, where it ultimately came to rest after sideswiping a tree. Fitzgerald followed the SUV into the field and stopped his vehicle when the SUV struck the tree.

As he was departing his vehicle, Fitzgerald saw the driver exit the SUV. Fitzgerald drew his weapon from his holster as the driver advanced toward him. The driver yelled profanities at Fitzgerald and drew a black object from his waistband, which Fitzgerald believed was a handgun. Fitzgerald ordered the driver to "drop the gun," but the driver refused. When the driver raised the object and pointed it in his direction, Fitzgerald fired three shots. A second later, Fitzgerald saw the driver turn in a lateral direction and then heard the sound of a gunshot. In response, Fitzgerald fired three more shots in the driver's direction. The driver momentarily fell to a knee. He then stood up, dropped the black object, and ran away.[4] That entire encounter— from the time that the driver initially approached Fitzgerald to the time that he fled—lasted approximately five seconds.

Fitzgerald chased the fleeing driver through the field and into an adjacent parking lot and alley at an apartment complex. As he did so, Fitzgerald repeatedly ordered the driver to stop, but the driver did not comply. With Fitzgerald closing ground on him in the alley, the driver abruptly stopped, turned toward Fitzgerald, and again reached into his waistband, at which point Fitzgerald fired a seventh shot at him. The driver, later identified as Frederick Devon McAllister, then surrendered, raising his hands to his head. As he did so, Fitzgerald observed that McAllister's white T-shirt was covered in blood. McAllister was transported to a nearby hospi-

tal, where he was pronounced dead as the result of a single gunshot wound.

The plaintiffs commenced this wrongful death action in 2010. Following a trial, the jury returned a verdict in favor of the defendants on all counts. The court denied the plaintiffs' subsequent motion to set aside the verdict and rendered judgment accordingly. This appeal followed.

I

Section 53a-22 (c) authorizes the use of deadly force by peace officers in two instances. See generally *State* v. *Smith*, 73 Conn. App. 173, 196–98, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002). The first instance is when an officer "reasonably believes such [force] to be necessary to . . . [d]efend himself or herself or a third person from the use or imminent use of deadly physical force . . . ." General Statutes § 53a-22 (c) (1). The second instance in which an officer is authorized to use deadly force is when the officer "reasonably believes such [force] to be necessary to . . . effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes has committed or attempted to commit a felony which involved the infliction or threatened infliction of serious physical injury and if, where feasible, he or she has given warning of his or her intent to use deadly physical force." General Statutes § 53a-22 (c) (2). On appeal, the plaintiffs claim that the court improperly instructed the jury on § 53a-22 (c) (2) because the evidence adduced at trial did not reasonably support such a charge. In response, the defendants contend, as a threshold matter, that the general verdict rule bars review of that claim. We agree with the defendants.

Following the commencement of this civil action, the defendants filed an answer and multiple special defenses. Relevant to this appeal is their third special defense, which alleged that "[a]t all times mentioned herein [Fitzgerald's] use of force to make an arrest, prevent an escape *or* protect himself and other persons from deadly physical force was reasonable pursuant to [§] 53a-22 (c)." (Emphasis added.) The plaintiffs conceded at trial that they bore the burden of proving that Fitzgerald's use of deadly force was not justified under either subdivisions (1) or (2) of § 53a-22 (c) in establishing their wrongful death case.

It is undisputed that the interrogatories provided to the jury did not distinguish the two instances in which peace officers are authorized to use deadly force. Specifically, the first interrogatory asked: "Do you find that the [plaintiffs] have proven that the use of deadly force by [Fitzgerald] was not justified, pursuant to [§] 53a-22 (c) of the General Statutes?" That interrogatory plainly does not differentiate between deadly force used pursuant to § 53a-22 (c) (1) and (2). As a result, the defendants

submit that review of the plaintiffs' instructional error claim is barred by the general verdict rule.

The general verdict rule "relieves an appellate court from the necessity of adjudicating claims of error that may not arise from the actual source of the jury verdict that is under appellate review. In a typical general verdict rule case, the record is silent regarding whether the jury verdict resulted from the issue that the appellant seeks to have adjudicated. Declining in such a case to afford appellate scrutiny of the appellant's claims is consistent with the general principle of appellate jurisprudence that it is the appellant's responsibility to provide a record upon which reversible error may be predicated. . . . In the trial court, the rule relieves the judicial system from the necessity of affording a second trial if the result of the first trial potentially did not depend upon the trial errors claimed by the appellant. Thus, unless an appellant can provide a record to indicate that the result the appellant wishes to reverse derives from the trial errors claimed, rather than from the other, independent issues at trial, there is no reason to spend the judicial resources to provide a second trial." (Citation omitted; internal quotation marks omitted.) *Dowling* v. *Finley Associates, Inc.*, 248 Conn. 364, 371–72, 727 A.2d 1245 (1999).

Accordingly, under the general verdict rule, "an appellate court will presume that the jury found every issue in favor of the prevailing party . . . and decline further appellate review. . . . Where there was an error free path available to the jury to reach its verdict, and no special interrogatories were submitted showing which road the jury went down, any judgment rendered on such a verdict *must* be affirmed." (Citations omitted; emphasis added.) *Jackson* v. *H.N.S. Management Co.*, 109 Conn. App. 371, 372–73, 951 A.2d 701 (2008). "[I]n a case in which the general verdict rule operates, if any ground for the verdict is proper, the verdict must stand; only if every ground is improper does the verdict fall." *Gajewski* v. *Pavelo*, 229 Conn. 829, 836, 643 A.2d 1276 (1994).

Our Supreme Court "has held that the general verdict rule applies to the following five situations: (1) denial of separate counts of a complaint; (2) denial of separate defenses pleaded as such; (3) denial of separate legal theories of recovery or defense pleaded in one count or defense, as the case may be; (4) denial of a complaint and pleading of a special defense; and (5) denial of a specific defense, raised under a general denial, that had been asserted as the case was tried but that should have been specially pleaded." (Internal quotation marks omitted.) *Kalams* v. *Giacchetto*, 268 Conn. 244, 255, 842 A.2d 1100 (2004). The third situation is implicated in the present case, as the defendants pleaded, in their third special defense, that Fitzgerald's use of deadly force was reasonable both "to make an arrest, prevent

an escape" as well as to "protect himself . . . from deadly physical force . . . pursuant to General Statutes § 53a-22 (c)." That pleading thus set forth distinct legal theories on which the jury could find that Fitzgerald's use of deadly force was statutorily authorized.

We conclude that the general verdict rule precludes review of the plaintiffs' claim. The record reveals that the plaintiffs did not request any interrogatories that would clarify the jury's findings with respect to those separate legal theories under § 53a-22 (c) (1) and (2). They do not argue otherwise in this appeal.

We likewise are not persuaded by the plaintiffs' claim that, despite their failure to request such an interrogatory, the fact that the defendants allegedly did so renders the general verdict rule inapplicable. The plaintiffs, citing *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 561 n.4, 898 A.2d 178 (2006), claim that as long as either party requests an interrogatory that addresses the matter in question, the general verdict rule is inapplicable. But see *Tetreault* v. *Eslick*, 271 Conn. 466, 471, 857 A.2d 888 (2004) (stating that reviewing court will presume jury found every issue in favor of prevailing party if jury renders general verdict for one party and "the party raising a claim of error on appeal did not request" interrogatories). The plaintiffs' claim fails because the interrogatory requested by the defendants does not directly address the matter in question—namely, whether the jury found that Fitzgerald's use of deadly force was authorized under § 53a-22 (c) (1) or (2).

The following additional facts are relevant to that claim. Toward the close of the defendants' case, the court held a charging conference, at which counsel had an opportunity to participate in the formulation of the jury charge. The defendants' counsel requested an interrogatory to ascertain whether the jury found that the deadly blow was delivered as part of the six shots in the field or the one shot later fired in the alley. As she stated: "Judge, I just have one thought on interrogatories. I think it's important for purposes of knowing how this verdict was reached . . . to know whether the jury found that the shooting was one of the first six shots in the field or the seventh shot in the alley because . . . there's varying things that happened to justify or not justify . . . those two separate uses of deadly force. . . . [W]e know that only one bullet hit him. So, it could only be either the seventh shot or one of the first six shots in the field. . . . I think the jury should be asked which one they find that it is, and I think they know it has to be one of them, so they have to pick one . . . . I don't see how it hurts anything to have them decide . . . and I think it's important to know how . . . on what set of facts they were finding the justification for [the use of deadly] force . . . ."

Counsel indicated that her primary concern was that, absent her requested interrogatory, the jury's delibera-

tions might be complicated in the event that they found that the use of deadly force was justified in one instance, but not the other. As she explained: "[L]et's say that they determine it was the seventh shot in the alley that struck him. If they find that, their only consideration is whether the use of deadly force at that moment was justified. They can't find that [Fitzgerald] was wrong for taking the first six shots in the field if they didn't hit him and, conversely, they can't find that the use— for example, let's say they hate the idea of the seventh shot, it's a horrible thing and [they] hate the seventh shot. However, [they] find that more likely than not, it was one of the first six in the field that hit him. I don't think that they can be allowed to deliberate—I think they need to be instructed that they have to only choose one or the other, and that is the one that they determine is justified, not the other one, and I don't see how it hurts anything at all." During a colloquy with counsel, the court suggested that it could address that concern in its instruction to the jury on proximate cause:

"The Court: [T]he only statute we have to worry about . . . is § 53a-22 (c)—do you find that the plaintiff has proven that the use of deadly force was not justified? So, if they find, whether it was in the field or whether it was in the alley—if they find that the use of deadly force was—if they find that it wasn't justified for a shot—and I can charge them on this, and I think you— you may have a point there. If they find that the use of deadly force was not justified at one location—

"[The Defendants' Counsel]: Right.

"The Court: —and find that the fatal shot was not fired at that location, then that use of deadly force would not be the proximate—would not be the legal cause of the decedent's death.

"[The Defendants' Counsel]: Yes, that's exactly—

"The Court: However, if they find that a shot was fired at a location and that the use of deadly force was not justified, and that shot caused the death of the decedent, then they would answer that the plaintiffs have met their burden of proof and they would answer yes to this interrogatory.

"[The Defendants' Counsel]: That addresses my concern; that's what I was looking for."

The plaintiffs' counsel then articulated his opposition to such an instruction, stating that he "would oppose that on this—on these grounds. That forces a decision on the jury to decide which shot it was." The plaintiffs' counsel argued that "the instruction needs to advise them that those elements need to co-exist at the time of the fatal shot . . . without placing a burden on the plaintiff that appears to or does require the jury to identify specifically which shot it was. . . . They have to find that there was no reasonable justification for the fatal shot." He further stated that he "would be

worried about an instruction that defined for [the jury] the two areas where the shooting may have occurred" because there was evidence before the jury that "some or all of the six shots were taken . . . somewhere in the field between the patrol car and the SUV and the entrance to the alley." Next came a noteworthy exchange between the court and the plaintiffs' counsel:

"The Court: But there's an additional justification, and the expert testimony showed that, there's an additional justification for the use of deadly force in the alley that didn't apply in the field.

"[The Plaintiffs' Counsel]: True."

When the charging conference continued several days later, the defendants' counsel again requested "a factual interrogatory about whether it was one of the first six shots in the field or the seventh shot in the alley because I do believe that that is an important factual finding that relates to the rest of their decision making in this case." The court denied that request.

In the present case, the plaintiffs claim that the court improperly instructed the jury on the use of deadly force pursuant to § 53a-22 (c) (2). To avoid application of the general verdict rule, they therefore must demonstrate that the requested interrogatory would have indicated whether the jury found that Fitzgerald's use of force was authorized under § 53a-22 (c) (1) or (2). They cannot do so.

Had the court provided the interrogatory requested by the defendants, the jury simply would have been asked whether Fitzgerald delivered the deadly blow as part of the six shots in the field or the one shot fired in the alley. The answer to that factual question would not shed light on whether the fatal shot was justified pursuant to § 53a-22 (c) (2). Although the plaintiffs, in both their appellate brief and at oral argument, focus primarily on the shot fired in the alley, it nevertheless remains, as counsel for the plaintiffs conceded at the charging conference, that an "additional justification" for the use of deadly force existed for that shot. Put differently, effecting an arrest or preventing escape pursuant to § 53a-22 (c) (2) was—in addition to defending oneself from deadly physical force pursuant to § 53a-22 (c) (1)—a justification potentially present in the alley.[5] As such, even if the defendants' requested interrogatory had been given to the jury, the record still would be inadequate to ascertain which of the two justifications set forth in § 53a-22 (c) the jury found applicable to the present case.

Irrespective of whether it found the fatal shot to have been fired in the field or the alley, the jury nonetheless could have found that Fitzgerald reasonably believed that deadly force was necessary to defend himself from the imminent use of deadly physical force pursuant to § 53a-22 (c) (1). The plaintiffs in this appeal do not

allege any error with respect to the court's charge on that subdivision of § 53a-22 (c), nor do they allege evidential insufficiency with respect thereto.[6] As a result, even if the court had provided the interrogatory requested by the defendants, an error free path would remain available for the jury to reach its verdict. The present case thus is "a typical general verdict rule case" because "the record is silent regarding whether the jury verdict resulted from the issue that the appellant seeks to have adjudicated." *Curry* v. *Burns*, 225 Conn. 782, 790, 626 A.2d 719 (1993). Accordingly, we conclude that the general verdict rule precludes review of the plaintiffs' claim of instructional error.[7]

## II

The plaintiffs also contend that the court abused its discretion in denying their motion to set aside the verdict due to the alleged misconduct of the defendants' counsel at trial. We disagree.

"The proper appellate standard of review when considering the action of a trial court in granting or denying a motion to set aside a verdict is the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done. . . . [T]he role of the trial court on a motion to set aside the jury's verdict is not to sit as [an added] juror . . . but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did. . . . In reviewing the action of the trial court in denying [or granting a motion] . . . to set aside the verdict, our primary concern is to determine whether the court abused its discretion. . . . The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to [the] evidence. Moreover, the trial judge can gauge the tenor of the trial, as [this court], on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Internal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 698–99, 41 A.3d 1013 (2012); see also *Palkimas* v. *Lavine*, 71 Conn. App. 537, 542, 803 A.2d 329 (abuse of discretion standard governs review of motion to set aside verdict predicated on "improper remarks of counsel"), cert. denied, 262 Conn. 919, 812 A.2d 863 (2002).

The plaintiffs' allegation of misconduct is twofold. They argue that the defendants' counsel improperly elicited testimony at trial regarding McAllister's criminal record, in contravention of the court's order proscribing such evidence. The plaintiffs also claim that the defendants' counsel made improper references to

McAllister's criminal record, his intoxication on the evening of January 31, 2008, and the possibility of "a trial on [his] criminal charges" during her closing argument. We address each claim in turn.

A

The plaintiffs first argue that the defendants' counsel wilfully violated the court's order proscribing the introduction of evidence regarding McAllister's criminal history.[8] The following additional facts are relevant to that claim. Prior to trial, the plaintiffs filed a motion in limine to preclude, inter alia, evidence of McAllister's criminal history. The court partially granted that motion, stating that "I think the jury should have a full picture of the decedent [so, I will] allow some of that, but I may . . . limit the testimony of that to specific instances, so that this does not turn into a trial of the criminal history of [McAllister]." The court also stated that the defense could present such evidence "for [the] limited purpose" of establishing wrongful death damages. For that reason, the court concluded that such evidence was "relevant only on the issue of noneconomic damages and for no other purpose."

The defense largely complied with those orders, submitting no documentary evidence or questions to witnesses regarding McAllister's criminal history. As part of their case-in-chief, the defendants called Tanisha Benjamin as a witness. Benjamin testified that she was McAllister's girlfriend and was living with him at the time of his death. Benjamin also testified that she had found crack cocaine packaged for sale in a closet, which led her to confront McAllister over her suspicion that he was dealing drugs out of their home. Notably, the defense did not ask her any questions about McAllister's criminal record.

On cross-examination, the plaintiffs' counsel asked Benjamin if she was "in love" with McAllister; she answered, "[y]es." Counsel then asked, "And did you think he was in love with you?" Benjamin answered, "[n]o."

Soon after that testimony, the defendants' counsel began her redirect examination by asking Benjamin if she was okay. At that moment, the court then asked Benjamin if she wanted "to take a minute; why don't we just suspend for . . . just a minute." The court then instructed Benjamin to "[h]ave some water there. Just take your time. You take your time and don't—you tell us when you're ready."

When Benjamin indicated that she was ready to proceed, she engaged in the following colloquy with the defendants' counsel:

"[The Defendants' Counsel]: And we've . . . talked about this many times before.

"[Benjamin]: Yes.

"[The Defendants' Counsel]: And . . . you're willing to talk to me about that, right?

"[Benjamin]: Yes.

"[The Defendants' Counsel]: And I know this is hard. Why didn't you believe that [McAllister] was in love with you?

"[Benjamin]: Because at the end, I felt like I didn't know why he lied to me, and he didn't tell me he had more children and about his criminal record. I felt that if he loved me enough, he would have told me everything instead of lying to me.

"[The Defendants' Counsel]: You felt like he wasn't the person that he represented himself to be to you?

"[Benjamin]: Yes.

"[The Defendants' Counsel]: And you found out after he died about his criminal record?

"[Benjamin]: Yes.

"[The Defendants' Counsel]: What did you find out about that?

"[Benjamin]: He—

"[The Plaintiffs' Counsel]: Object.

"The Court: Sustained.

"[The Defendants' Counsel]: Nothing further. Thank you.

"The Court: All right."

The plaintiffs did not move to strike Benjamin's reference to McAllister's criminal history, nor did they move for a mistrial or seek a curative instruction from the court. To the contrary, they asked a follow-up question during their recross-examination of Benjamin:

"[The Plaintiffs' Counsel]: . . . [T]his alleged record that we're talking about; is that something that Attorney Edwards told you?

"[Benjamin]: Yes.

"[The Plaintiffs' Counsel]: Okay. Thank you."

On appeal, the plaintiffs now contend that the defendants' counsel committed "blatant misconduct" marked by "unconscionable behavior." For several reasons, we do not agree.

First, the record indicates that the defendants' counsel did not raise the subject of McAllister's criminal history with *any* witness at trial. Second, with respect to Benjamin's testimony, counsel did not discuss that criminal history during her direct examination of Benjamin. Rather, it was Benjamin who broached the subject during redirect examination, and in response to the question of why she believed that McAllister did not love her—which was in direct response to the plaintiffs'

query, "[D]id you think he was in love with you?" Third, at no time did the plaintiffs move to strike Benjamin's reference to McAllister's criminal history, nor did they move for a mistrial or seek a curative instruction from the court.[9] See *State* v. *Luster*, 279 Conn. 414, 428, 902 A.2d 636 (2006) (when opposing counsel "does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize [his client's] right to a fair trial" [internal quotation marks omitted]). Rather, their sole objection came in response to a subsequent question as to precise details of what Benjamin learned about that criminal record. As a result, Benjamin's earlier references to McAllister's criminal history were in evidence before the jury. Fourth, the plaintiffs' counsel proceeded to ask his own follow-up question on McAllister's criminal history to Benjamin during his recross-examination. Having declined to object to Benjamin's testimony that McAllister had a criminal record and having subjected that testimony to the crucible of cross-examination at trial, it appears somewhat disingenuous to now claim on appeal that the court abused its discretion in denying the plaintiffs' motion to set aside the verdict due to the admission of that testimony into evidence.

Fifth, and perhaps most significantly, we are mindful that a determination as to whether an attorney committed impropriety is a question of fact. See, e.g., *Palkimas* v. *Lavine*, supra, 71 Conn. App. 546 (in cases alleging improper argument by counsel, preliminary issue to be resolved is whether the remarks were improper); see also *State* v. *Gibson*, 302 Conn. 653, 659, 31 A.3d 346 (2011) (explaining that first step of prosecutorial impropriety analysis entails factual determination of whether any impropriety occurred). In resolving that factual inquiry, the court did not find that any impropriety had transpired. During argument on the plaintiffs' motion to set aside the verdict, the court specifically noted that "as far as the motion in limine . . . I indicated very clearly all the time that I couldn't rule in a vacuum, that there could be situations where the door might be open to certain evidence, and I wasn't going to be precluded from making that determination based upon a factual predicate."

The plaintiffs portray the isolated colloquy during redirect examination of Benjamin as part of a cleverly concocted and brilliantly executed plan by the defendants' counsel to circumvent the court's general preclusion of testimony regarding McAllister's criminal history.[10] We decline to venture down that trail of speculation and conjecture, which "have no place in appellate review."[11] (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 510, 970 A.2d 578 (2009). Instead, we view the cold record before us, cognizant of the trial court's superior vantage point and the deference

accorded thereto. We therefore conclude that the defendants' counsel did not improperly elicit testimony from Benjamin regarding McAllister's criminal record.

## B

We next consider the plaintiffs' claim that the defendants' counsel engaged in improper argument in her closing remarks. "[T]he trial court is invested with a large discretion with regard to the arguments of counsel . . . . [W]hile its action is subject to review and control, we can interfere only where the discretion was clearly exceeded or abused to the manifest injury of some party. . . . In fact, the court must allow [c]ounsel . . . a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel . . . ." (Citations omitted; internal quotation marks omitted.) *Skrzypiec* v. *Noonan*, 228 Conn. 1, 15–16, 633 A.2d 716 (1993).

Closing argument by the defendants' counsel extends over thirty pages of the October 17, 2012 transcript. At issue is one paragraph therefrom, in which counsel argued: "[I]f [McAllister] had pulled over in response to [Fitzgerald's] light and sirens, none of this ever would have happened. It would not have happened. And one of the things that you are going to be asked to address by the judge in your deliberations is something called causation. And causation is what it sounds like; it's what's the cause. What caused this? And you have to determine, what caused this? Was it any bad act by [Fitzgerald] or the Bridgeport Police Department? Was it caused by [McAllister's] illegal actions? And I told you at the beginning of this case, everything that happened happened because of what [McAllister] did. This never would have happened if he pulled over and allowed himself to be identified. This never would have happened if he didn't crash through a fence and hit a tree. It never would have happened if he hadn't gotten out of his car and disobeyed [Fitzgerald], threatened him, yelled at him, tried to escape, that never would have happened. And you might . . . wonder, well, why would [McAllister] do this? Why would he act this way? And I think we all know why he would act this way. *He's got a criminal record.* He is a drug dealer. He's got someone in the car who has a gun. He doesn't have a driver's license. *He is intoxicated.* He is trying to avoid the police. He has every reason to avoid the police, but he can't do that. That is not how it works. If you don't believe you should be . . . pulled over, you don't believe you should be arrested; we have a court for that. That is why we are here. *We could have had a trial on* [*McAllister's*] *criminal charges.* You would be the jury. We could have had a trial if he had a false arrest claim, if he thought for some reason he was unjustly arrested. We could have had a trial about that. He would have been here. But instead we are having

a trial about his death, and we didn't need to have that trial. We have courts so that we can address issues like this. [McAllister] didn't want to be in that system. He didn't want to obey the police. He didn't want to go through the court system. He wanted to run and hope he got away." (Emphasis added.)

The plaintiffs claim that the defendants' counsel improperly argued that McAllister had "a criminal record" and was "intoxicated" on the night of January 31, 2008. Those claims require little discussion. Her single reference to the criminal record simply mirrored the aforementioned testimony from Benjamin at trial. Her reference to McAllister being intoxicated at the time of his encounter with Fitzgerald likewise finds evidentiary support in the record before us. The toxicology report filed as part of the autopsy performed by the Office of the Chief Medical Examiner, which was introduced into evidence at trial, confirmed that McAllister had a blood alcohol level between 0.08 and 0.09 at the time of his death. In ruling on the plaintiffs' pretrial motion in limine, the court held that although such evidence was not "an objective standard of intoxication . . . it is relevant to show that there was some use of a substance of this nature, which the jury might be able to consider for whatever it wishes . . . ." The court also clarified that "just the mere fact that he had been drinking is something that maybe the trier of fact can consider." In light of the toxicology report admitted at trial, we conclude that the defendants' counsel's single reference to the fact that McAllister was "intoxicated" at the time of the encounter with Fitzgerald fell within the bounds of fair argument on the evidence.

Last, the plaintiffs assail the reference by the defendants' counsel to the possibility of having "a trial on [McAllister's] criminal charges . . . ." They argue that this statement both improperly referenced McAllister's criminal history and was "factually false and intentionally misleading."[12] The plaintiffs misconstrue that statement. Read in the context of the full statement by the defendants' counsel, it appears plain to us that she was not referencing McAllister's criminal history or any charges that were pending *prior* to his encounter with Fitzgerald. Rather, she was noting that McAllister could have opted to pull his vehicle over instead of fleeing when Fitzgerald attempted to effectuate a motor vehicle stop. McAllister then could have challenged the propriety of that police stop and any criminal charges stemming therefrom in a court of law. For that reason, we perceive no impropriety with the statement to that effect by the defendants' counsel.

C

Even if we were to conclude that any statements by the defendants' counsel were improper, the plaintiffs still could not prevail. To obtain a reversal of the court's decision to deny their motion to set aside the verdict,

the plaintiffs must demonstrate that they suffered manifest injury. *Sturgeon* v. *Sturgeon,* 114 Conn. App. 682, 690, 971 A.2d 691 (harmed party seeking to set aside judgment in civil case must show manifest injury), cert. denied, 293 Conn. 903, 975 A.2d 1278 (2009).

In denying the motion to set aside, the court aptly noted: "[A]s to the criminal record, there was some testimony from one witness, the girlfriend of the decedent, who testified that she learned from the city attorney's office that the decedent had a criminal record, that both the source of the information and the statement were before the jury in evidence; that's all the jury had heard. I think the jury was properly informed and followed the instruction that closing arguments are not evidence, they are merely argument and designed to help the jury interpret the evidence, but it's the jury's recollection of the evidence that controls. The fact that that one piece of evidence was before the jury, I don't believe affected or impacted the jury's verdict in any way in determining the use of deadly force, the negligence of the officers of the city of Bridgeport, other than [Fitzgerald], and whether or not that negligence was a substantial factor in causing injury. It might have provided a motive to flee, but . . . there was no real contest or real issue over the fact that he did flee or did try to evade apprehension by a police officer whose lights and sirens were in operation at the time. So, the jury had, I think, ample evidence to find as it did . . . ."

We concur with that assessment, and emphasize that the "action of the trial court is entitled to weight because of the vantage point from which it can observe and evaluate the circumstances of the trial. The trial court is in a better position to determine the propriety of the remarks of counsel and whether or not they are harmful." *State* v. *Glenn,* 194 Conn. 483, 493, 481 A.2d 741 (1984). In *Yeske* v. *Avon Old Farms School, Inc.,* 1 Conn. App. 195, 205, 470 A.2d 705 (1984), this court held that, in the context of civil cases, "[a] verdict should be set aside if there has been manifest injury to a litigant, and it is singularly the trial court's function to assess when such injury has been done since it is only that court which can appraise the atmosphere prevailing in the courtroom." We decline to disturb the court's determination that the allegedly improper conduct by the defendants' counsel did not cause manifest injury to the plaintiffs. We therefore cannot say that the court abused its discretion in denying their motion to set aside the verdict.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Although the plaintiffs initially named the Bridgeport Police Department as an additional defendant, they withdrew all claims against that entity at trial.

[2] Detective William Reilly testified that roll call occurs at the beginning of an officer's shift and that the most important information conveyed at that time is information about wanted persons.

[3] Fitzgerald testified that an officer working an extra duty road job was considered to be on duty by the department.

[4] No weapon was recovered from the field. Officers did find a cell phone in the field near the SUV.

[5] In their reply brief, the plaintiffs contend that counsel for the defendants conceded during the charging conference that—in the plaintiffs' words—"the only possibly applicable statutory justification for Fitzgerald's use of deadly force" for the seventh shot in the alley was to effect an arrest or prevent escape pursuant to § 53a-22 (c) (2). The plaintiffs characterize that statement as a "binding judicial admission." (Emphasis omitted.) A review of the transcripts reveals that the defendants' counsel made no such sweeping concession. Rather, she repeatedly noted that the justification for the use of deadly force in the field differed from that with respect to the seventh shot in the alley. After the court clarified that "there's an additional justification for the use of deadly force in the alley that didn't apply in the field," the court stated that "the second justification [pursuant to subdivision (2)] is inapplicable to the first six shots. It might be, based on what the trier of fact might find, applicable to the seventh." The defendants' counsel then indicated her agreement with those propositions by responding, "Right."

Two concessions emerge from those statements. First, the defendants acknowledged that the second justification pursuant to subdivision (2) did not apply to the shots fired in the field. Second, the potential justification for the use of deadly force in the alley differed from that in the field. The latter concession is entirely consistent with the defendants' argument at trial that both justifications under § 53a-22 (c) (1) and (2) were implicated by the seventh shot fired in the alley.

[6] During cross-examination by the plaintiffs' counsel, Fitzgerald testified in relevant part:

"[The Plaintiffs' Counsel]: . . . [A]t the time that you took your seven shots at [McAllister], you believed you were at risk of bodily harm or death, correct?

"[Fitzgerald]: Yes.

"[The Plaintiffs' Counsel]: And it's that alleged or that perceived threat to you that in your view . . . justified you taking the seven shots at him?

"[Fitzgerald]: Not just in my view, I believe I have the right by state law. . . .

"[The Plaintiffs' Counsel]: . . . And your purpose in shooting [McAllister] seven times was to protect yourself from the alleged threat that he posed to you?

"[Fitzgerald]: On the threat, yes. . . .

"[The Plaintiffs' Counsel]: . . . [T]he reason that you took the seventh shot was because you believed [McAllister] posed a risk of harm to you?

"[Fitzgerald]: I thought he was about to turn around and kill me."

[7] We further note the unique procedural posture of this case. Not only did the plaintiffs fail to submit any interrogatories pertaining to the issue they now seek to have adjudicated, they also opposed the interrogatory requested by the defendants. Moreover, when the court—after a lengthy discussion of proposed interrogatories—stated that "[w]e're getting very close to a general verdict in this case, and I don't know who that helps," the plaintiffs' counsel responded that "[a] general verdict is looking pretty good." The court then suggested that it could simply provide the jury with both a plaintiffs' verdict form and a defendants' verdict form for each count. The plaintiffs' counsel responded, "I agree." When counsel for the defendants then restated her view that "a general verdict form would be inappropriate" under the circumstances, the plaintiffs' counsel replied, "I argue the opposite."

Permitting an appellant, who, when before the trial court, argued against the inclusion of a interrogatory request by the opposing party, to now rely on that very interrogatory strikes this court as inequitable and contrary to well established law regarding induced error. "[T]he term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling. . . . It is well established that a party who induces an error cannot be heard to later complain about that error." (Internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 59 n.32, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). Indeed, the defendants in their appellate brief argue, inter alia, that "the plaintiffs told the trial court that they agreed with the language of the interrogatory, which waived their right to disagree with it now."

We already have determined that the interrogatory requested by the defendants would not have resolved the inadequacy of the record with respect to the basis of the jury's finding that Fitzgerald's use of deadly force was authorized under § 53a-22 (c). We therefore need not consider whether any induced error on the part of the plaintiffs provides an independent basis for determining that the general verdict rule applies in this case.

[8] The plaintiffs aver that "[d]efense counsel's calculated violation of the court's preclusion order also ran afoul of the Rules of Professional Conduct. See, e.g., Rule 3.4 . . . ." We decline to address that bald assertion set forth in a footnote to their principal appellate brief.

[9] To be clear, the plaintiffs objected to a follow-up question by the defendants' counsel, by which she sought to ascertain what Benjamin learned about McAllister's criminal record. The court sustained the objection to that line of inquiry, and the defendants' counsel immediately concluded her redirect examination.

[10] During argument on the plaintiffs' motion to set aside the verdict, the defendants' counsel expressed her incredulity with that allegation, noting that if the plaintiffs' counsel "had sat down without asking [Benjamin] any questions at all, this never would have happened."

[11] During argument on their motion to set aside the verdict, the plaintiffs' counsel argued that Benjamin's reference to McAllister's criminal history was "the most manufactured piece of colloquy of examination of a witness I believe I've ever seen . . . . I mean, it was just a setup . . . ." The trial court, having observed that colloquy at trial and the context in which it arose, nevertheless rejected that argument.

[12] On that point, the plaintiffs argue that "as defense counsel well knew, we could not have a trial on [McAllister's] criminal charges because there were no criminal charges pending against him anywhere in or near this jurisdiction." (Emphasis omitted.)